IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAVELIN INVESTMENTS, LLC, *ET AL.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Civil Action H-05-3379 |
| | § | |
| ANGELA MCGINNIS AND MICHAEL | § | |
| MCGINNIS, | § | |
| *Defendants.* | § | |

## MEMORANDUM AND RECOMMENDATION

This copyright infringement case arising out of the construction of a residence is before the court on the parties' cross-motions for summary judgment (Dkts. 86, 96, 115). Having considered the parties' submissions, arguments at the January 9, 2007 hearing, and the law, the court recommends that plaintiffs' motion be denied, defendants' motions be granted, and this case be dismissed with prejudice.

## 1.   UNDISPUTED FACTS

In 2003, the McGinnises began working with plaintiffs Lynda Wood, Nick DiMinico, and Javelin Investments, L.L.C. d/b/a Alta Construction (collectively "Wood") on plans for an extensive remodeling of their house.  The remodeling plans were generated by David Garcia of Plandraft, Inc., neither of whom are parties to this action.  After receiving a cost estimate that was more expensive than they anticipated, the McGinnises decided to rebuild their home instead of remodeling.

On March 15, 2004, the McGinnises entered into a residential construction contract with the builder Alta Construction.  Wood and DiMinico signed the residential construction

contract on behalf of Alta.  The construction plans were also generated by David Garcia of Plandraft, Inc.  Wood asserts that she provided detailed information to Garcia on which he based the plans and that she spent hours sitting with Garcia at the computer as he drafted the plans.[1]  Garcia testified that the plans were substantially based on the design and layout of the original house, without mentioning any direction or assistance from Wood.[2]

Also in March 2004, Michael McGinnis provided the McGinnises' lender, Chase Manhattan Mortgage Corporation, with a "Certificate of Architect" in order to secure a construction loan.[3]  The Certificate of Architect, signed by David Garcia as President of Plandraft, Inc., identifies Plandraft as the architect/designer of the construction plans for the McGinnis residence.  Pursuant to the Certificate of Architect, the lender and its nominees were given a license to use the construction plans, or any modification of them, to construct the McGinnis residence.

After construction began, the McGinnises became dissatisfied.  They sued Wood in state court for breach of contract and other claims.  In September 2004,  Wood's previous lawyer, Louis Bonham, wrote a letter to the McGinnises' counsel warning of a copyright infringement suit should the McGinnises finish the house using the existing construction

---

[1]     Affidavit of Lynda Wood, Exhibit 1 to plaintiffs' response in opposition to defendants' emergency motion (Dkt. 121), ¶¶ 2-5.

[2]     Affidavit of David Garcia, Exhibit B to defendants' emergency motion (Dkt. 115), ¶ 11.

[3]     Affidavit of Edward Rogers, Exhibit E to defendants' emergency motion (Dkt. 115), ¶ 6-8 and Exhibit A.

plans.  That letter implicitly acknowledges Plandraft as the copyright owner:

> Technically, Plandraft, Inc. would appear to be free to sue your clients and
> their contractor for copyright infringement immediately, as it is not a party to
> the state court action.  However, I am advised that Plandraft has agreed to
> assign its copyrights and copyright infringement claims to my clients so that
> the parties can attempt to resolve all outstanding issues.[4]

The parties settled the state court lawsuit in April, 2005, according to terms reflected

in an April 14, 2005 Rule 11 agreement.  At that time, the house was completely framed, but

no sheetrocking or finishes had been completed.  The Rule 11 agreement provides:

> [The McGinnises] acknowledge that the original drawings were submitted to
> the city and were lost.  [The McGinnises] agree that they will not use the
> original drawings or derivatives by Lynda Wood for the construction of the
> house.  [Wood] acknowledge[s] that the builder may need to reference the
> drawings to correct defects in the existing structure.[5]

The McGinnises hired an architect, James Sheblak, to create plans for finishing the house.

The McGinnises took measurements of the partially constructed house and provided them

to Sheblak for the purpose of creating new plans.[6]  Construction of the house was completed

in October 2005.

In September and October 2005, disputes arose regarding each side's compliance with

the settlement agreement.  The McGinnises asserted in state court that Wood breached the

---

[4]     September 27, 2004 letter from Louis K. Bonham to W. Michael Taylor, Exhibit C to
defendants' emergency motion (Dkt. 115).

[5]     April 14, 2005 settlement agreement, Exhibit 6 to plaintiffs' response to defendants'
emergency motion (Dkt. 115).

[6]     Affidavit of Angela McGinnis, Exhibit 3 to plaintiffs' motion (Dkt. 86), ¶ 7; Affidavit of
Michael McGinnis, Exhibit 4 to plaintiffs' motion (Dkt. 86), ¶ 7.

agreement by failing to make a required monthly payment.  Wood responded that the McGinnises breached the agreement by using Wood's plans to complete the house, and thereby eliminating any payment obligations.  The state court found that Wood breached the settlement agreement by failing to make required payments and entered an Agreed Judgment in the amount of $125,000 in favor of the McGinnises.

On September 29, 2005, Wood filed a copyright registration for an "architectural work" titled "McGinnis Residence – Not yet constructed."  The registration form, signed by Malcolm E. Whitaker, plaintiffs' attorney in this case, identifies Wood as the author of the work and states that the work was not a work made for hire.[7]

On November 18, 2005, Garcia signed an agreement ("Work Made for Hire Agreement") purporting to agree that the plans he generated were a work made for hire from the moment of their creation, and alternatively assigning Plandraft's copyright ownership of the plans to Wood.  Despite the representation in the November 18 agreement, Garcia has testified that he always believed Plandraft, Inc. owned the rights to the construction plans and he never believed the plans were a work made for hire.[8]  Garcia asserts he signed the November 18 agreement because he hoped Wood would pay him money she owed him for other work.[9]

---

[7]    Exhibit 2 to plaintiffs' motion (Dkt. 86).

[8]    Affidavit of David Garcia, Exhibit B to defendants' emergency motion (Dkt. 115), ¶¶ 12, 17.

[9]    *Id.*, ¶ 18.

On September 30, 2005, Wood filed this federal lawsuit asserting breach of contract and copyright infringement claims against the McGinnises. The contract claim was previously dismissed on *res judicata* grounds.[10] All parties now seek summary judgment on the copyright infringement claim.[11] In addition, the McGinnises argue that Wood (and counsel) intentionally and wrongfully withheld evidence of the license granted by the Certificate of Architect.

2.      **LEGAL STANDARDS**

     A.      **Summary Judgment Standards**

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne*

---

[10]     July 21, 2006 Memorandum and Recommendation (Dkt. 85), adopted by the district court (Dkt. 91). Because the only claim remaining in this case is copyright infringement, and there are no allegations that DiMinico owns a copyright, summary judgment dismissing DiMinico's copyright claim is appropriate without extended discussion.

[11]     Plaintiffs complain that defendants' motions are successive and should be denied on that basis alone. Defendants' prior motion addressed claim preclusion, not the merits of plaintiffs' claims. Moreover, the current motions directly respond to the issues raised by plaintiffs' motion. Under the circumstances, the court exercises its discretion to consider defendants' motions.

*Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).  If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party.  *Id.* at 255.

### B.   Copyright Infringement of an Architectural Work

A plaintiff in a copyright infringement case must prove two things:  (1) ownership of a valid copyright; and (2) copying of the constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 367-68 (5th Cir. 2004).  *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994).  In this case, Wood asserts ownership of a valid copyright on the architectural work known as the "McGinnis Residence – Not yet constructed," and copying of that architectural work by the McGinnises.

Copyright protection is available for original works of authorship in the following categories:  (1) literary works; (2) musical works, including any accompanying words; (3)

6

dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works.   17 U.S.C. § 102(a).   An architectural work is:

> the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings.  The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101.[12]  Thus, copyright protection for an architectural work may encompass both architectural plans and constructed buildings.  *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 109-10 (1st Cir. 2006); *Guillot-Vogt Assoc., Inc. v. Holly & Smith*, 848 F. Supp. 682, 686-87 (E.D. La. 1994).

Copyright ownership is demonstrated by establishing proof of originality, copyrightability, and compliance with applicable statutory formalities.  *See Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995).  A valid copyright certificate of registration constitutes *prima facie* evidence of the validity of a copyright.  *Id.* (citing 17 U.S.C. § 410(c)).  This presumption is rebuttable, and the burden shifts to the defendant to produce evidence of invalidity of the plaintiff's copyright.  *Entertainment Research v. Genesis Creative Group*, 122 F.3d 1211, 1217 (9th Cir. 1997); *CMM Cable Rep, Inc. v. Ocean Coast Prop., Inc.*, 97 F.3d 1504, 1513 (1st Cir. 1996); *Masquerade Novelty v. Unique*

---

[12]     Prior to 1990, copyright protection did not extend to buildings, as opposed to architectural plans.  Protection for architectural works was added by The Architectural Works Copyright Protection Act, codified in scattered sections of Title 17 of the United States Code.

*Indus.*, 912 F.2d 663, 668 (3d Cir. 1990).

Initial ownership of a copyright vests in the author of the work.[13]   Transfer of ownership of a copyright, other than by operation of law, must be in writing and signed by the owner.  17 U.S.C. § 204(a); *Lulirama Ltd. v. Axcess Broadcast Serv., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997).

Two components underlie proof of actionable copying.  First is the factual question of whether the alleged infringer actually used the copyrighted material.  This may be proven by direct evidence, but the fact of copying typically is inferred from evidence of access to the copyrighted work and probative similarity.  *Eng'g Dynamics*, at 1340; *Positive Black Talk*, 394 F.3d at 367-68.  Probative similarity exists when two works, when viewed as a whole, bear sufficient similarity that it could be inferred that the later created work was copied because one would not expect such similarities to arise independently.  *Positive Black Talk*, 325 F.3d at 370.

---

[13]     Works made for hire are an exception to this general rule.  A work made for hire is defined by statute as:

(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

Although the plaintiff argued in briefing that Wood owned the copyright in the plans pursuant to the work made for hire doctrine, counsel expressly confirmed on the record at the January 9 hearing that plaintiffs are not relying on the work made for hire doctrine in this case.

Second, and usually more difficult, is the question whether the factual copying is legally actionable. *Eng'g Dynamics*, 26 F.3d at 1341. This requires the court to determine whether there is substantial similarity between the two works at issue. *Id.*; *See Positive Black Talk*, 394 F.3d at 367-68 ("To establish actionable copying (i.e., the second element), a plaintiff must prove: (1) factual copying *and* (2) substantial similarity, emphasis added). Substantial similarity requires that the "copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Positive Black Talk*, 394 F.3d at 370 (quoting *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

3.    **Wood's Motion for Summary Judgment**

Wood's motion falls far short of demonstrating an absence of disputed material facts and entitlement to summary judgment as a matter of law. Indeed, Wood's shifting positions over the course of this case can most charitably[14] be construed as **generating** material fact issues.

The issue of ownership is a prime example. Over the course of this case, Wood has asserted four different and largely inconsistent methods by which she acquired ownership of the copyright in the plans at issue:

(1)  In a letter of September 27, 2004, Wood's previous counsel Louis Bonham asserted that the construction plans were created by Plandraft, Inc. and licensed to Alta

---

[14]    The court declines defendant's invitation to infer bad faith from these admittedly head-swerving changes of position.

Construction, and that "Plandraft has agreed to assign its copyrights and copyright infringement claims to my clients."[15]

(2)  In September 2005, Wood filed both her copyright application and original complaint alleging that she herself created the plans, making no reference to Plandraft or Garcia.[16]  In fact, her copyright application certified that the plans were neither a derivative work nor a work made for hire.[17]

(3)  On November 18, 2005, Wood and Garcia signed a "Work Made for Hire Agreement" acknowledging that the design was created by Plandraft and intended to be a work made for hire from the moment of its creation. The agreement further provided for Plandraft to assign its interest in the work and the registration to Wood.[18]

(4)  In November 2006, Wood submitted an affidavit declaring that she herself created the original design  and embodied it in a set of  plans hand-drafted by herself. Her hand-drafted plans (which are not in the record) were then provided to Garcia so he could "copy" them with a CAD (computer aided design) program and convert them into working plans for the house.  Based on this affidavit, Wood now claims that Garcia was merely a "scrivener"

---

[15]    Exhibit C to Original Complaint (Dkt. 2), at 3 n.1.

[16]    *Id.* at ¶ 3.

[17]    Exhibit 4 to Lynda Wood's Affidavit, Exhibit 1 to plaintiffs' response to defendants' cross-motion (Dkt. 107).

[18]    Exhibit 1 to Lynda Wood's Affidavit, Exhibit 1 to plaintiffs' response to defendants' cross-motion (Dkt. 107).

whose CAD drawings were entirely derivative of her hand-drawn plans.[19]

In sum, the summary judgment record shows that over time Wood has invoked four contradictory theories of copyright ownership in the plans attached to her original complaint: (1) assignment, (2) original authorship, (3) work made for hire, and (4) derivative work. This inconsistent behavior at a minimum creates a fact issue as to the ownership element of her infringement claim.[20]

Shifting positions aside, the summary judgment record reflects other fact issues precluding summary judgment for plaintiffs. Wood's current claim that Garcia acted as merely the "scrivener" for her original design is contradicted by Garcia's own testimony regarding the process by which the drawings were created and his personal belief that he

---

[19]    Plaintiffs' response to defendants' emergency motion (Dkt. 121), at 15-16.

[20]    The McGinnises do not argue that Wood transferred ownership of the copyright in the construction plans to them in the Construction Plans Agreement, although that is arguably the case. That Agreement provides:

> Ownership of the Plans and Drawings.  The Plans and Drawings shall be the property of the Homeowners for purposes for the use by the Homeowners for any real property owned by the Homeowners including the Property; provided, however, (a) in the event the Homeowners contract the construction of the improvements to the Property with any construction company other than the Contractor or its affiliates, the Homeowners shall pay to the Contractor the amount of $1,750 in addition to the consideration set forth on Schedule II, attached hereto, and (b) other than for the construction, in whole or part, of the improvements to any real property owned by the Homeowners including the Property, the Homeowners shall not be permitted to sell, transfer or otherwise permit any third party to utilize the Plans and Drawings for such third party's use and benefit.

Exhibit B to defendants' response (Dkt. 95), ¶ 5.

owned the drawings himself.[21]   Other fact issues on this record include the extent of the

alleged copying,[22] and whether there was  substantial similarity between Wood's drawings

and the Sheblak plans used to finish the house.[23]  It is possible that any similarities between

the house as constructed and Wood's construction plans are the result of structural necessity,

not copying.

For these reasons, Wood's motion for summary judgment should be denied.

## 4.   The McGinnises' Motions for Summary Judgment

---

[21]   Affidavit of David Garcia, Exhibit B to defendants' emergency motion (Dkt. 115), ¶¶ 12, 17.

[22]   Wood relies upon the following testimony from Michael McGinnis as direct evidence of
copying of the copyrighted architectural work:

> In October and November of 2004, my [spouse] and I personally
> measured the dimensions of the house located at 9164 Westview
> Drive, Houston, Texas 77055. These notes, drawings and annotations
> were turned over to James Sheblak, who then prepared new plans
> regarding the construction of the house based on our drawings.  Mr.
> Sheblak did not use or rely on Lynda Wood's drawings to prepare the
> new drawings.

Affidavit of Michael McGinnis dated October 11, 2005, Exhibit 4 to Plaintiffs' motion.

[23]   The Sheblak plans are not in the record, so direct comparison is not possible at this stage.
The only evidence that Wood submits is the following suggestive but inconclusive testimony
of Michael McGinnis from the state court proceeding:

Q:   Would it be a fair statement that the plans that were drawn by Mr. Sheblak were
substantially similar to Ms. Wood's copyrighted plans for the 9164 Westview house?

A:   I believe the floor plans would be.  The house was one-third built.  The house was
completely framed.  It's OSB and everything, OSB on the roof.  We shingled it.  And
we put Tybek [sic] on it.  But other than that, I mean the house was an existing
structure.  So, to the extent whatever Alta construction did was there.  I assume to the
extent they filed her plans, there were similarities, a lot of similarities.

While fact questions on ownership and copying preclude summary judgment for Wood, the McGinnises enjoy a statutory defense that entitles them to summary judgment, even if all disputed fact issues were resolved against them.[24]

## A.    Building Owner's Alteration Rights Under 17 U.S.C. § 120(b)

The Architectural Works Copyright Protection Act of 1990 ("AWCPA") amended federal copyright law to comply with international treaty obligations by creating a new category of copyright subject matter– "architectural works," defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101.   However, one striking feature of the AWCPA is "the limited scope of the protection it affords to architectural works."  Raphael Winick, *Copyright Protection for Architecture After the AWCPA of 1990,* 41 Duke L.J. 1598, 1622 (June 1992).   The main limitation is found in § 120(b), which provides:

> (b) Alterations to and destruction of buildings.– Notwithstanding the provisions of section 106(2)[25], the owners of a building embodying an architectural work may, without the consent of the author or copyright owner of the architectural work, make or authorize the making of alterations to such building, and destroy or authorize the destruction of such building.

As the parties have pointed out, there is a dearth of case law interpreting § 120(b). However, the legislative history explains that the provision is meant to prevent a copyright

---

[24]    The McGinnises assert other grounds for summary judgment, such as express license, implied license, and invalid registration, which need not be reached in light of the disposition on § 120(b).

[25]    Section 106(2) prohibits preparing a derivative work based on a copyrighted work. 17 U.S.C. § 106(2).

owner, who holds exclusive right to prepare derivative works, from interfering with alterations to habitable architectural works. *See* H.R. 101-735, 101st Cong., 2d Sess., 1990 U.S.C.C.A.N. 6935, 6953 (1990).  As one commentator has elaborated:

> Responding to pragmatic concerns, Congress chose to deprive architectural woks of protections offered to other copyrightable works.  Holders of copyrights in architectural works can neither prevent alteration and destruction of their works, nor prevent the production of two-dimensional pictorial copies of the work.  Congress correctly viewed alteration and destruction of a building by its owner to be practical necessities. . . ..  In order to perform its utilitarian functions, a building must be able to adapt and change. Conditioning changes on the approval of the original architect may lead to frustrating delays.

Winick, 41 Duke L.J. at 1622-23.

### B.    Wood's Challenges to the § 120(b) Defense

In its supplemental post-hearing brief, Wood posits three arguments why section 120(b) should not apply.

***Contract Argument*–**   First, Wood argues the McGinnises contractually agreed in the April 14, 2005 settlement agreement that they "will not use the original drawings or derivatives by Lynda Wood for the construction of the house."[26]  According to Wood, § 120(b) "does not relieve Defendants of their contractual duties."  As a general rule, it is true that architects and building owners may agree as a matter of contract law to enlarge the scope of copyright protection for an architectural work beyond the limits set by the AWCPA.  *See* Hearing before the House Subcommittee on Courts, Intellectual Property and the

---

[26]    April 14, 2005 settlement agreement, Exhibit 6 to plaintiffs' response to defendants' emergency motion (Dkt. 115).

Administration of Justice, House Judiciary Committee, 101st Cong., 2nd Sess. (March 14, 1990), at 102; Winick, 41 Duke L.J. at 1623-24.  But the source of that expanded protection is the contract, rather than the statute.  Therefore, the remedy for enforcing that additional protection must also lie in contract, not the statute.  As noted previously, the only remaining cause of action before this court is a statutory claim of copyright infringement under 17 U.S.C. § 501 *et seq.*  Wood's state law contract claims have already been adjudicated in favor of the McGinnises.  *Res judicata* precludes this court from re-litigating whether Wood's contractual rights were violated by the manner in which the McGinnises constructed their house.[27]

***Express Limitations of § 120(b)***– Wood next argues that section 120(b) is inapplicable because it "does not expressly state that a homeowner has the right to finish construction of a house by generating a 'new' set of plans by copying the existing structure."[28]  In support, Wood relies upon a statement in the legislative history  that the drafters "believed it advisable to spell out expressly the limitations contained in section

---

[27]     Wood does not argue, and the record does not support, a theory that the McGinnises  waived any statutory defense to copyright infringement afforded by § 120(b).  Typically, in order to be enforceable, a waiver of a statutory right must at a minimum be knowing and voluntary.  *See Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *Mosely v. St. Louis Southwestern Ry.*, 634 F.2d 942, 946-47 (5th. Cir. 1981).  Here, the parties' settlement agreement made no reference to section 120(b) or any other provision of the AWCPA or the Copyright Act in general.  Nor did it purport to address either party's rights in respect to a statutory infringement claim, which is not surprising since at that time Javelin had not yet filed any application for copyright protection with the Copyright Office.  Thus, even if the waiver argument were not barred by *res judicata*, the summary judgment record affords no reasonable basis to infer that any putative waiver was knowing or voluntary.

[28]     Plaintiffs' supplemental brief (Dkt. 130), at 10-11.

120(b)."[29] But this argument can just as easily, and with more justification, be turned around.

Section 120(b) does not expressly contain any limitation upon the manner or means by which

a homeowner may exercise his right to alter the structure.  Presumably, no such limitations

were intended by Congress, else they would be expressed in § 120(b).  Significantly, the

original draft of the AWCPA permitted only "minor" or "necessary" changes by the building

owner absent the architect's consent.  Hearing before the House Subcommittee on Courts,

Intellectual Property and the Administration of Justice, House Judiciary Committee, 101st

Cong., 2nd Sess. (March 14, 1990), at 5-6.  The unrestricted alteration right was inserted at

the urging of the American Institute of Architects.  One influential architect, Michael Graves,

argued persuasively that retention of an architect's "veto" over building alterations would not

in practice benefit the architect, because building owners would then demand assignment of

all copyright interests up front as a standard condition of any engagement. *Id.*, Statement of

Michael Graves, at 15-16; Winick, 41 Duke L.J. at 1623.  Given this history, the failure to

specify permissible methods of alteration is unremarkable, and supports no inference of an

implied restriction.

Wood's implied limitation upon § 120(b) alteration rights also defies common sense.

Wood argues that the McGinnises had three alternatives if they wished to finish their house:

---

[29]     See House Report 101-735 (Sept. 21, 1990), at 6953-54 ("While the provisions of section
109(a) apply to architectural works, in light of the fact that architectural works represent a
new category of protected subject matter, and unlike other forms of subject matter are
habitable, the Committee believed it advisable to spell out expressly the limitations contained
in section 120(b).").

(1) getting Plaintiffs' permission to use Plaintiffs' plans; (2) finishing construction without using any plans; or (3) substantially altering the existing structure so that it was not "substantially similar" to Plaintiffs' plans.[30] These supposed alternatives illustrate perfectly the predicament building owners would face *in the absence* of § 120(b).  Option 1 would give the architect a "veto" over subsequent adaptation and even repair of inhabitable buildings, a result not only impractical but also inimical to the best interest of architects in the long run.[31]  Option 2 is a recipe for professional malpractice and structural failure. No professional architect or builder would commence a substantial renovation project without drawings or plans reflecting the existing structure.  One common way to generate such plans is to measure the existing structure, as the McGinnises admittedly did here.  It would serve little purpose for Congress to expressly grant homeowners the right to make whatever changes they wish to their own homes, while silently denying them the practical means to exercise that very right.  Option 3 merely encourages economic waste, forcing the owner to destroy work product which he has already bought and paid for.  These "alternatives" to § 120(b) sharply illustrate the practical wisdom of Congress in bestowing upon building owners a limited statutory license to modify their own buildings.

*__Exclusion for Direct Copying of Plans__*– Wood's final argument is that even if section

---

[30]     Plaintiffs' response (Dkt. 107), at 5.

[31]     *See* Hearing before the House Subcommittee on Courts, Intellectual Property and the Administration of Justice, House Judiciary Committee, 101st Cong., 2nd Sess. (March 14, 1990) Statement of Michael Graves, at 15-16.

120(b) allows the McGinnises to copy the existing house, it does not allow them to directly copy Wood's plans. This argument represents yet another shift of position by Wood. At the January 9 summary judgment hearing, Wood's counsel acknowledged that there was no direct evidence that the McGinnises copied her plans. Wood's summary judgment motion was based on the testimony of the McGinnises "admitting" that they measured the dimensions of the unfinished structure which were then used to prepare as-built plans to complete construction of the house.[32] Wood now asserts that the McGinnises actually copied her plans, and in support of this contention belatedly offers the affidavit and expert report of plaintiffs' designated expert, engineer Carl Mattern, Jr.[33] Mattern compared the drawings for the residence prepared by Alta Construction with drawings allegedly obtained from the City of Houston Permit Archives titled "A Residence for Mr. & Mrs. Michael McGinnis 9164 Westview." Based on "the similarity of dimensioning of the two sets of drawings," Mattern concludes that the drawings on file with the City of Houston were made by copying the Alta drawings.[34]

This evidence is inadmissible for a number of reasons. First of all, the affidavit was not served prior to the hearing, as required by Rule 56(c) ("The adverse party prior to the day

---

[32]  Plaintiffs' motion (Dkt. 86), at 8-9, citing Affidavit of Angela McGinnis, Exhibit 3 to plaintiffs' motion (Dkt. 86), ¶ 7 and Affidavit of Michael McGinnis, Exhibit 4 to plaintiffs' motion (Dkt. 86), ¶ 7.

[33]  Expert Report of Carl Mattern, Exhibit 3 to Plaintiffs' supplemental brief (Dkt. 130).

[34]  *Id* at 2.

of hearing may serve opposing affidavits"). Leave of court was neither sought nor given[35] to supplement the record with late-filed evidence under Rule 56(e), and no affirmative showing of excusable neglect has been made. *See Slaughter v. Southern Talc Co.,* 919 F.2d 304, 307 (5th Cir. 1990) (district court has discretion to refuse to accept late-filed summary judgment affidavits). In addition, the plans obtained from the City of Houston are not properly authenticated by evidence sufficient to support a finding that they are what Wood claims: the Sheblak plans actually used by the McGinnises to complete their house.[36] The copy of the plans attached to Mattern's affidavit are undated, unsigned, uncertified, and contain no reference to Sheblak. Given this lack of foundation, any conclusion Mattern may have drawn from comparison of these two documents is not probative of anything.[37]

Evidentiary problems aside, Wood's argument that § 120(b) does not give the McGinnises the right to copy Wood's plans for the limited purpose of finishing the house is untenable as a matter of law. It is undoubtedly true that a homeowner could not copy the architectural plans in order to build another home on another site. The statute itself plainly precludes that possibility. 17 U.S.C. § 120(b) ("owners of a building which embodies a

---

[35]   At the hearing the court advised the plaintiff that it would likely grant defendants' motion on the basis of § 120(b), and invited the plaintiff to file additional briefing on that issue. No permission was granted to expand the summary judgment record with additional evidence.

[36]   The parties confirmed at the January 9 hearing that the Sheblak plans were not a part of the summary judgment record.

[37]   In light of this ruling, there is no need to address other potential infirmities in the Mattern affidavit, such as whether Mattern, a non-architect, is qualified to render an expert opinion on the originality of architectural plans.

copyrighted architectural work may. . . make or authorize the making of alterations *to such building*. . .").  But it seems equally clear that § 120(b) places no limits upon the means by which building owners may alter their buildings without fear of infringement.  Whether that alteration is accomplished by  measuring the existing structure or by copying the original plans for the existing structure is simply immaterial.

In support of her argument, Wood relies upon (and badly misreads) *Guillot-Vogt Assoc. v. Holly & Smith,* 848 F. Supp. 682 (E.D. La. 1994).  That case did not involve a copyright claim to "architectural works" under the AWCPA.  Instead of architectural plans or drawings, that dispute was over a copyright for *engineering* drawings for the mechanical and electrical portions of a construction project.  The defendants there argued that because the engineering plans did not fall within the definition of architectural works under the AWCPA, they were not entitled to any protection under the Copyright Act. The district court properly rejected that argument, noting that such technical drawings are copyrightable as "pictorial" or "graphic" works under 17 U.S.C. § 102(a)(5). *Id.* at 687. The court also rejected the defendants' alternative argument  that § 120(b) bars a copyright claim to the engineering plans because the construction project involved an alteration to an existing structure:

> [T]his section [120(b)] is not intended to nullify copyright protection in *drawings* as being asserted by GVA here.  The drawings in question in the instant case are not a building, and as GVA conceded, **they are not any other form of architectural work. Thus, section 120(b) is plainly inapplicable to the instant case,** and defendants' argument in this regard must fail as well**.**

848 F. Supp. at 687 (italics in original, bold emphasis supplied).  In other words, the *GVA* court merely held that § 120(b) applies only to copyrights in architectural works, and the engineering plans at issue there did not fall within that category.

By contrast, § 120(b) is clearly applicable here.  The plans at issue unquestionably constitute "architectural work" within the definition of 17 U.S.C. § 101, as Wood herself asserted in her copyright application.[38]  The defendants are unquestionably owners of the building that is claimed to embody those plans.  The allegedly infringing acts involve the homeowners' alteration of the structure for which the plans were originally made.  Therefore section 120(b)'s express limitation on the scope of exclusive rights in architectural works has been  triggered here.

Wood's narrow interpretation of § 120(b) would effectively nullify the very protection it was intended to grant.  Wood's own argument shows why this is so.  Lacking direct evidence of copying, Wood relies upon the "similarity of dimensioning" to infer that her plans must have been copied.  But this inference could well be drawn in almost any renovation project; unless the existing structure is completely demolished, the dimensions of the original building will necessarily be integrated into the alteration plans.  Thus, home alteration projects would almost always be vulnerable to challenge on grounds that the original plans must have been copied.  If such challenges were permitted, then section 120(b) would fall far short of its intended purpose "to permit the owners of buildings to do whatever

---

[38]     Exhibit 2 to plaintiffs' motion (Dkt. 86).  Wood has neither applied for nor asserted a copyright in the drawings as "pictorial" or "graphic" works under § 102(a)(5).

they want" with their buildings.    Hearing before the House Subcommittee on Courts, Intellectual Property and the Administration of Justice, House Judiciary Committee, 101st Cong., 2nd Sess. (March 14, 1990), at 44, 76, 125, 130.

The infringing conduct of which Wood complains fits comfortably within the safe harbor afforded by § 120(b).  Section 120(b) must be construed to permit such copying, else its protections would be rendered largely nugatory.  Wood's claim of copyright infringement is therefore barred by the AWCPA.

5.    **CONCLUSION**

Defendants are entitled to judgment as a matter of law on plaintiffs' copyright infringement claim.  Therefore, the court recommends that plaintiffs' motion for summary judgment (Dkt. 86) be denied, and defendants' motions for summary judgment (Dkts. 95, 115) be granted.

The parties have ten days from service of this Memorandum and Recommendation to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* FED. R. CIV. PRO. 72.

Signed at Houston, Texas on January 23, 2007.

Stephen Wm Smith
United States Magistrate Judge